IN THE UNITED STATES COURT OF APPEALS
FOR THE FIFTH CIRCUIT

United States Court of Appeals
Fifth Circuit

**F I L E D**

October 12, 2007

Charles R. Fulbruge III
Clerk

No. 06-60582

PEOPLES BANK, a Division of First Tennessee Bank, NA

Plaintiff - Appellant

v.

BRYAN BROTHERS CATTLE COMPANY; B & S CATTLE COMPANY

Plaintiffs - Appellees

v.

CORNERSTONE BANK

Defendant - Appellant

Appeal from the United States District Court
for the Northern District of Mississippi

Before JONES, Chief Judge, and REAVLEY and SMITH, Circuit Judges.

REAVLEY, Circuit Judge:

This case is to determine ownership of cattle and whether two contesting banks held a security interest in them. The district court[1] granted summary judgment for the buyer of the cattle on the ground that the apparent seller was the owner and passed title to the buyer free of a lien. We hold that a fact issue

---

[1] The proceedings below were conducted by a magistrate judge with the authority to issue final judgment pursuant to 28 U.S.C. § 636(c) and the consent of the parties. In this opinion, all references to the "district court" are to the opinion and judgment of the magistrate judge.

exists on the ownership of the apparent seller, and we reverse the judgment.

Bryan Brothers Cattle Company and B&S Cattle Company ("Bryan") paid Glenbrook Cattle Company ("Glenbrook") for the cattle, but two banks—Peoples Bank and Cornerstone Bank—claim that Brooks L. "Louie" Dickerson was the owner and had previously granted them liens on the cattle. Each bank claims priority to the other. No other parties are before us now, and the decision depends, first, on whether Bryan has to pay one of these banks or did Bryan buy the cattle free of liens as the district court held, and second, if Bryan has to pay again, to which bank. We hold that Cornerstone has the superior lien on Dickerson's cattle and that the ownership of Glenbrook presents an issue precluding summary judgment.

## I. Background

On October 5, 1999, Dickerson granted a security interest in the cattle he owned to Cornerstone in exchange for a loan. Cornerstone filed a financing statement with the Mississippi Secretary of State on October 14, 1999 and named "Louie Dickerson" as the debtor.

In 2001, Dickerson, Ellen Hardy, Bill Weeks and John David Weeks discussed forming an enterprise involving cattle, with Dickerson apparently as the catalyst for the idea. Between that time and February 2002, the parties began formulating the plan. Hardy and the Weeks brothers contributed cash (for example, Hardy put in $230,000), and it appears that Dickerson devised the business plan and began putting the operational and financial side of the business into place. The enterprise was to be called Glenbrook Cattle Company. There is a dispute about the intended role of the parties in the enterprise—for example, whether Dickerson was to be the sole owner or if each of the parties had an ownership stake. This is at the heart of the present legal dispute, and the relationship among the parties is detailed below.

On February 13, 2002, Dickerson established a bank account at BancorpSouth Bank in Senatobia, Mississippi in the name of "Louie Dickerson,

2

dba Glenbrook Cattle Company." The account was listed as existing for a sole proprietorship, and the taxpayer ID for the account was Dickerson's social security number. This is the only bank account that Glenbrook held or maintained in any capacity, although Dickerson had a number of other bank accounts at BancorpSouth and other banks (with those accounts listed under his personal name, as well as under the names of his other businesses).

On November 8, 2002, a Certificate of Formation for a Limited Liability Company ("LLC") was filed in the Office of the Mississippi Secretary of State under the name Glenbrook Cattle Company, with Dickerson as the registered agent. It appears that no official action was taken with regard to the LLC subsequent to the certificate filing.

At about the same time, in November 2002, Dickerson borrowed money from Peoples in exchange for a security interest in the cattle he owned or later acquired. Peoples filed one financing statement in November 2002 and two others in September 2003. The financing statements listed "Brooks L. Dickerson," Dickerson's legal name, as the debtor.

Starting in early 2002, Glenbrook began to operate as a cattle pre-conditioning business in Tate County, Mississippi.[2] Dickerson handled the financial side of the business including the billing and receivables, apparently with little input from the other principals. Glenbrook hired Clayton Zweirschke as the farm manager, responsible for the day-to-day running of the pre-conditioning program.

Bryan has maintained a cattle operation in Happy, Texas for many years. Typically, Bryan takes physical possession of cattle in Texas following completion of a pre-conditioning period. Bryan first bought cattle pre-conditioned by Glenbrook in July 2002. Dennis Bryan, one of the principals in the company,

---

[2] Cattle pre-conditioning involves taking calves just weaned from the mother and getting them healthy for shipment to a grazing program. The process, which lasted about 50 days in the Glenbrook program, includes giving appropriate vaccinations, teaching the calves how to eat grass and feed, and fattening the calves.

and Zweirschke developed a business relationship, which resulted in Bryan's regularly buying cattle from Glenbrook. At that time, Glenbrook bought cattle from sale barns, pre-conditioned the cattle and then, at the end of the pre-conditioning period, placed the cattle on the market to sell to the highest bidder, which sometimes was Bryan.

Beginning in 2003, Glenbrook changed its cattle operations, which altered the arrangement with Bryan. Under the new arrangement, Bryan placed orders for certain cattle at the beginning of each week. Zweirschke forwarded these orders to commission buyers at the sale barns. During the week, these buyers purchased the cattle, forwarding the invoices to Glenbrook. Each day, the sale barns shipped the cattle to Glenbrook, where the cattle received a Bryan brand and a color-coded ear tag. Glenbrook then notified Bryan of the various purchases and sent Bryan a copy of the invoices and a bill of sale. After Bryan wired funds to Glenbrook during each week, Glenbrook mailed a check to the sale barn. At the end of the pre-conditioning period, Glenbrook shipped the cattle to Bryan in Texas, charging $.70 per pound of weight gained during the pre-conditioning period.

In May 2004, approximately 1,600 head of cattle, intended for Bryan, were in various stages of Glenbrook's pre-conditioning program. On May 19, 2004, Zweirschke contacted Bryan and told it to immediately arrange shipment of the cattle currently in Glenbrook's pre-conditioning program, because Glenbrook was out of money to purchase feed and vaccines.

As Bryan and Zweirschke were in the process of shipping the cattle, a local justice court issued a restraining order prohibiting the further shipment of the cattle. Bryan deposited money with the court, took possession of the majority of the remaining cattle, and removed the case to federal court. The federal district court clerk is now holding $342,500.00 on deposit. The court ultimately granted Bryan's motion for summary judgment, holding that Bryan purchased the cattle free and clear of liens. The court determined that the financing statements

4

Peoples and Cornerstone filed were perhaps effective as to Dickerson individually, but that their security agreements were not perfected as to Glenbrook, which bought and sold the cattle at issue. The court also denied Peoples' claim that its security agreement was superior to Cornerstone's.

## II. Discussion

Peoples and Cornerstone appeal the district court's summary judgment that Bryan purchased the cattle from Glenbrook free and clear of their security interests. Peoples also appeals the court's denial of its motion regarding the superiority of its security interest to Cornerstone's.

We hold that there is a fact issue precluding summary judgment for Bryan. We agree with the rejection of Peoples' claim of security interest superiority.

### A. Standard of Review

We review grants of summary judgment de novo. Tex. Indus., Inc. v. Factory Mut. Ins. Co.[3] Summary judgment is appropriate if the record shows "that there is no genuine issue as to any material fact and that the moving party is entitled to a judgment as a matter of law." FED. R. CIV. P. 56(c). If the nonmovant sets forth specific facts in support of allegations essential to his or her claim, a genuine issue of material fact is presented, and summary judgment is inappropriate. Coleman v. Houston Indep. School Dist.[4] However, "[w]here the record taken as a whole could not lead a rational trier of fact to find for the non-moving party, there is no genuine issue for trial." Matsushita Elec. Indus. Co. v. Zenith Radio Corp.[5]

### B. Did Bryan Brothers Purchase the Cattle "Free and Clear"?

Peoples and Cornerstone argue that because liens were properly perfected

---

[3] 486 F.3d 844, 846 (5th Cir. 2007).

[4] 113 F.3d 528, 533 (5th Cir. 1997).

[5] 475 U.S. 574, 587, 106 S. Ct. 1348, 1356 (1986) (internal quotations and citation omitted).

on Dickerson and his property, the property sold by Glenbrook, which operated as Dickerson's sole proprietorship, was sold subject to their security interests. Bryan counters that the cattle were not subject to Peoples' or Cornerstone's liens on Dickerson's property because Bryan purchased the cattle from Glenbrook, which operated as either a partnership or a LLC (i.e., an entity separate from Dickerson's individual holdings), and thus Dickerson could not encumber Glenbrook's property. We hold that there is a fact issue as to whether Glenbrook operated as a sole proprietorship, partnership, or LLC. Thus, summary judgment as to this issue is improper.

### 1. The Security Interests Attach Only if Glenbrook Was a Sole Proprietorship of Dickerson

Under the Food Security Act ("FSA"), "a buyer who in the ordinary course of business buys a farm product from a seller engaged in farming operations shall take free of a security interest created by the seller, even though the security interest is perfected . . . and the buyer knows of the existence of such interest."[6] The parties do not dispute that the purchase of cattle here is covered by the FSA. But under the FSA a buyer of farm products takes subject to a security interest created by the seller in particular circumstances, including when "in the case of a farm product produced in a State that has established a central filing system . . . [1] the buyer has failed to register with the Secretary of State of such State prior to the purchase of farm products . . . and [2] the secured party has filed an effective statement or notice that covers the farm products being sold . . . ."[7] Mississippi has a central filing system but Bryan failed to register with the Mississippi Secretary of State prior to the purchase of the cattle. Therefore, the question is whether Peoples and Cornerstone filed statements that were effective and covered the cattle sold to Bryan.

---

[6] 7 U.S.C. § 1631(d).

[7] Id. § 1631(e)(2).

6

If Glenbrook operated as a partnership or LLC, Peoples and Cornerstone's statements do not cover the cattle sold to Bryan because the banks did not have a valid security interest in Glenbrook's property. In Mississippi, a security interest is enforceable against the debtor and third parties with respect to collateral when, among other things, "the debtor has rights in the collateral."[8]

If Glenbrook operated as a partnership or LLC, Dickerson did not have sufficient "rights in the cattle" to encumber them. Mississippi recognizes a partnership as a separate entity that may sue or be sued in the partnership's name.[9] Partnership property includes all property brought into the partnership when formed or subsequently acquired by purchase on account of the partnership.[10] Consequently, if Glenbrook existed as a partnership, the partnership owned the cattle and this partnership property is distinct from Dickerson's personal property.[11] A partner's right in specific partnership property is not assignable (except in connection with the assignment of rights of all partners), and it is not subject to attachment or execution, except on a claim against the partnership.[12] Consistent with these principles, in a personal loan agreement Dickerson could not, without the consent of any of the other Glenbrook principals, encumber property Glenbrook owned. Dickerson could not encumber property that was not his own.[13]

If Glenbrook operated as a LLC, the Peoples and Cornerstone security

---

[8] MISS. CODE ANN. § 75-9-203(b).

[9] Id. § 13-3-55.

[10] Id. § 79-12-15(1).

[11] Id. § 79-12-15(2) ("Unless the contrary intention appears, property acquired with partnership funds is partnership property."); see Crowe v. Smith, 603 So. 2d 301, 305–06 (Miss. 1992).

[12] Id. § 79-12-49(2)(b), (c).

[13] See In re Whatley, 874 F.2d 997, 1004 (5th Cir. 1989) (stating the standard rule that "one cannot generally encumber another's property").

7

interests do not attach to the cattle. In Mississippi, a "member [of a LLC] has no interest in specific limited liability company property."[14] The entity has independent power to, among other things, purchase and own personal property, sell or pledge personal property, and secure its obligations with a pledge of its personal property.[15] It follows that an individual owner (Dickerson) of a LLC owned by multiple parties, cannot encumber specific LLC property in a personal loan agreement with a creditor. Thus, if Glenbrook existed as a LLC owned by the four parties, Bryan takes the cattle free and clear of the Peoples and Cornerstone loans.

Peoples argues that Dickerson could encumber the cattle Glenbrook sold, pointing to cases decided under Mississippi law where a security interest was held to attach to collateral because the debtor had sufficient "rights in collateral." However, these cases do not lead to the conclusion that Dickerson could encumber Glenbrook's property if Glenbrook existed as a partnership or LLC owned by multiple parties.

Peoples points to In re Whatley.[16] In Whatley, this court held under Mississippi law that a corporation, owned by a husband and wife, had sufficient rights in collateral (farming equipment) to grant a security interest in the farming equipment to a lender, even though the husband, not the corporation, technically owned the farming equipment. The court reasoned that, while one generally cannot encumber another's property, the well-recognized exception of "consent by the property owner" allowed the security agreement the husband signed to be valid on behalf of the corporation.[17] Here, the consent theory does not apply because, if Glenbrook was owned by three other parties, Dickerson

---

[14] MISS. CODE ANN. § 79-29-701 (emphasis added).

[15] Id. § 79-29-108(2).

[16] 874 F.2d 997 (5th Cir. 1989).

[17] Id. at 999, 1003–04.

8

could not, without the consent of these parties, encumber the cattle owned by the entity in which each had an ownership stake.

If Glenbrook existed as Dickerson's sole proprietorship, the security interest attaches to the cattle Bryan purchased. Bryan does not contest that an individual has sufficient "rights in collateral" under Mississippi law to grant a security interest in collateral his sole proprietorship owns. However, Bryan points out correctly that, under the FSA provision at issue here, a buyer of farm products who has failed to register with a state's central filing system takes subject to a security interest the seller creates only if the secured party has filed an "effective financing statement" covering the farm products being sold.[18] Bryan argues that the financing statements that listed Dickerson (not Glenbrook) as the debtor were not effective as to the cattle that Bryan bought from Glenbrook.

Under the FSA, an effective financing statement must contain, inter alia, the name of the person indebted to the secured party.[19] The FSA and its implementing regulations do not indicate whether a financing statement that lists an individual's name is effective against entities that purchase farm products from the individual's sole proprietorship doing business under a trade name. In the absence of further provision in the FSA or case law, we will look to Mississippi law that also requires a financing statement to provide the name of the debtor.[20]

Peoples and Cornerstone properly obeyed the Mississippi Code by listing the debtor under Dickerson's individual name, rendering their financing statements effective if Glenbrook was Dickerson's sole proprietorship. "A financing statement that provides only the debtor's trade name does not

---

[18] 7 U.S.C. § 1631(e)(2).

[19] Id. § 1631(c)(4)(C)(ii).

[20] MISS. CODE ANN. § 75-9-502(a)(1).

sufficiently provide the name of the debtor."[21] However, the Mississippi Code states that a financing statement that provides the name of the debtor is not rendered ineffective by the absence of the debtor's trade name.[22] The Official Comment to Section 75-9-503 states that "the actual individual or organizational name of the debtor on a financing statement is both necessary and sufficient, whether or not the financing statement provides trade or other names of the debtor . . . ."[23] The banks' financing statements were not rendered ineffective by the absence of Dickerson's trade name if Glenbrook operated as Dickerson's sole proprietorship.

### 2. Was Glenbrook a Sole Proprietorship, Partnership, or LLC?

The district court erred in granting summary judgment to Bryan because a genuine issue of material fact exists as to Glenbrook's business form. Peoples presents sufficient evidence that Glenbrook existed as a sole proprietorship to overcome Bryan's summary judgment motion. The record shows that Dickerson opened the BancorpSouth bank account to which Bryan wired the funds for the cattle transaction at issue in the name of "Louie Dickerson, dba Glenbrook Cattle Company." Second, this bank account— Glenbrook's only one—was held as a sole proprietorship. Third, the taxpayer identification number for Glenbrook's account is Dickerson's social security number. Fourth, the bills of sale for the transaction with Bryan were signed by "Louie Dickerson/Glenbrook Cattle Company." Taken together, these facts raise a material issue as to whether Dickerson operated Glenbrook as a sole proprietorship, precluding summary judgment for Bryan.

There is substantial evidence that Glenbrook was a partnership, however. For example, a partnership appears to have been the intent of the initial

---

[21] Id. § 75-9-503(c).

[22] Id. § 75-9-503(b)(1).

[23] Id. § 75-9-503 cmt. 2.

10

principals—Dickeron, Hardy, and the Weeks brothers. While this evidence is sufficient to defeat Peoples' summary judgment motion, Bryan cannot establish as a matter of law that Glenbrook existed as a partnership.

In Mississippi, a partnership exists when two or more people carry on as co-owners a business for profit.[24] Courts consider three factors in determining if a partnership existed: "(1) the intent of the parties, (2) participation in control of the business and (3) profit sharing."[25]

Courts must examine the intent of the parties.[26] To form a partnership, "an express agreement is not required; intent may be implied, or established from the surrounding circumstances. . . . The manner in which the parties characterize the relationship is probative. The ultimate question is did the parties intend to do the acts that in law constitute partnership?"[27]

Here, there is no express agreement to form a partnership, but there is significant evidence that the parties intended to form a partnership. Hardy says that the four principals convened in 2001 and early 2002 and decided to form a "group" to work with cattle. She contributed $230,000 to the project, the Weeks brothers apparently contributed money as well, and Hardy avers that Dickerson agreed to run the "business side" of the operation. Hardy says that from the beginning she thought that she had an ownership interest in Glenbrook, and she refers to the business in her deposition as a joint venture among friends. She says that she viewed the Glenbrook cattle as being bought by all four of the principals.

---

[24] Smith v. Redd, 593 So. 2d 989, 993 (Miss. 1991) (citing MISS. CODE ANN. § 79-12-11).

[25] Summers v. A-1 Cash, Inc., 911 So. 2d 975, 979 (Miss. Ct. App. 2005) (citing Smith, 593 So. 2d at 994).

[26] Century 21 Deep S. Props., Ltd. v. Keys, 652 So. 2d 707, 715 (Miss. 1995); Smith, 593 So. 2d at 994.

[27] Smith, 593 So. 2d at 994 (internal citations omitted).

While there is substantial evidence that the parties intended a partnership, the evidence is not one-sided. At one point in her deposition, Hardy says in response to a question about whether she saw herself as a partner in Glenbrook, that she saw herself as an "investor." Dickerson says in his deposition that he did not see Glenbrook as a partnership, but rather he saw himself as the sole owner. Contradicting this testimony, elsewhere in his deposition he says that because of Hardy's input of an initial investment in Glenbrook, he believed that she had an ownership interest. These discrepancies need to be explored.

Participation in control of the business is also indicative of whether a partnership exists.[28] The evidence is scant that anyone other than Dickerson had partnership-like control of the business. However, partnership-like control varies by the circumstances of each particular partnership, and in some cases all the partners may not be equal participants in running the operations.[29] In fact, the intention of the partners may be for only one party to be in control.[30]

Nevertheless, the lack of partnership-like control by Hardy or the Weeks brothers (at least indicated by the summary judgment evidence) weakens Bryan's case. Hardy testified that she did some work on the farm, but she says that she did not have a hand in managing Glenbrook's operations. Furthermore, it appears that Dickerson exercised nearly exclusive control of Glenbrook's day-to-day operations, and he was in charge of the financial side of the business.

Profit-sharing is perhaps the most important indicator of a partnership.[31]

---

[28] Id.

[29] Id.

[30] Century 21, 652 So. 2d at 715 (holding that lack of partnership-like control by one party did not disprove the existence of a partnership).

[31] Id. (holding that the "one factor which is the most important in determining the existence of a partnership is profit sharing"); Smith, 593 So. 2d at 994.

12

In fact, the Mississippi statute explicitly says that profit sharing is generally prima facie evidence of partnership.[32] While profit sharing during the existence of a business is strong evidence of partnership, evidence that each of the parties had a right to share profits also indicates the existence of a partnership.[33]

Here, there is little evidence of actual profit sharing among the parties. The parties appear to have relied almost completely on Dickerson to control investment of the capital and to supervise how the income from the enterprise was to be disbursed. For example, Hardy says that on occasion Dickerson would give her a few hundred to a thousand dollars if she needed the money, but there is no evidence that this constituted sharing of Glenbrook's profits, or that there was a consistent stream of money to her from Glenbrook. The Weeks brothers apparently received some return on their initial investment, but there is no clear evidence that this constituted profit-sharing. Importantly, the Mississippi statute draws a distinction between sharing in profits, which is generally prima facie evidence of partnership, and sharing of gross returns, which is not.[34] Furthermore, if a party receives a share of the profits and this is received in repayment for a debt, it is not prima facie evidence of partnership.[35] Here, there is insufficient evidence to conclude at this stage that the money received by Hardy or the Weeks brothers was a share of the profits, and not in repayment for their initial investments.

There is some evidence that Hardy believed that the parties intended for each to have an equal share in the business, which is perhaps indicative of a right to share in the profits. Dickerson also says that he believed that all the

---

[32] MISS. CODE ANN. § 79-12-13(4); Smith, 593 So. 2d at 993.

[33] Smith, 593 So. 2d at 994–95 (holding that the right to share profits is a crucial inquiry and that the lack of clear evidence of profit-sharing in the case did not defeat the claim of partnership).

[34] MISS. CODE ANN. § 79-12-13(3), (4).

[35] Id. § 79-12-13(4)(a).

principals would make money from Glenbrook in time. However, without more this evidence does not persuade us that the four principals had a right to share in Glenbrook's profits.

Ultimately, while there are indications that Glenbrook existed as a partnership, this is not established as a matter of law. Taken as a whole, the evidence shows a material fact issue on the matter of partnership.

The district court rested its summary judgment for Bryan on the conclusion that Glenbrook existed as a LLC as a matter of law. But virtually all we have on this matter is the Certificate of Formation for a LLC filed on November 8, 2002 in the Office of the Mississippi Secretary of State under the name Glenbrook Cattle Company, with Dickerson as the registered agent. Without more, the LLC story is not developed enough to establish the operation of Glenbrook as a LLC at the relevant times in this case.

## C. The Priority of the Liens

Because we reverse the summary judgment awarding Bryan the cattle, we must review whether the court correctly denied the motion of Peoples on its claim that its security interest is superior to Cornerstone's. Peoples says its interests are superior, despite the fact that Cornerstone filed its financing statement in 1999, whereas Peoples filed in 2002 and 2003. We hold that the court correctly rejected the priority of Peoples.

### 1. Does Cornerstone's Financing Statement Correctly Name the Debtor?

Peoples argues that Cornerstone does not have a security interest in the cattle because its financing statement did not use Dickerson's legal name. Cornerstone's financing statement identified "Louie Dickerson" as the debtor instead of by his proper legal name, "Brooks L. Dickerson." Cornerstone argues that its financing statement was not seriously misleading and that Peoples had actual knowledge that Dickerson was known as "Louie Dickerson."

The Mississippi Code, which has enacted a version of the UCC filing

14

statute, states that a financing statement must "[p]rovide[] the name of the debtor."[36] If the debtor is an individual, the financing statement must contain the individual's name.[37] "A financing statement substantially satisfying the requirements of [the Code] is effective, even if it has minor errors or omissions, unless the errors or omissions make the financing statement seriously misleading."[38] Failing to sufficiently name the debtor is seriously misleading and makes the financing statement ineffective.[39]

Cornerstone's financing statement was not seriously misleading. "The purpose of the filing system is to give notice to creditors and other interested parties that a security interest exists in property of the debtor. . . . Perfect accuracy, however, is not required as long as the financing statement contains sufficient information to put any searcher on inquiry."[40] Peoples was put on inquiry notice that a security interest in the property of "Brooks L. Dickerson" could be listed under the name "Louie Dickerson." Dickerson held himself out to the community as Louie Dickerson, and he used this name in bank accounts, bills of sale, and with others with whom he did business. This is important because evaluating whether a filing is seriously misleading requires a court to examine the facts in a particular case, and the focus should be "on whether potential creditors would have been misled as a result of the name the debtor was listed by" in the financing statement.[41]

---

[36] Id. § 75-9-502(a)(1).

[37] Id. § 75-9-503(a)(4)(A).

[38] Id. § 75-9-506(a) (emphasis added).

[39] Id. § 75-9-506(b).

[40] In re Glasco, Inc., 642 F.2d 793, 795 (5th Cir. 1981) (internal citations and quotations omitted).

[41] Id. at 795–96; accord ITT Commercial Fin. Corp. v. Bank of the West, 166 F.3d 295, 301–02 (5th Cir. 1999).

Moreover, Peoples had actual notice that Dickerson was known as both "Louie Dickerson" and "Brooks L. Dickerson." In its own files, Dickerson is identified by both names in numerous places. Peoples was not seriously misled by Cornerstone's financing statement.

2. Does Cornerstone's Security Agreement Include After-Acquired Property?

Peoples argues that Cornerstone's security agreement does not attach to the cattle because it does not explicitly include after-acquired property and Glenbrook acquired the cattle at issue nearly five years after Dickerson executed the agreement. Cornerstone's security agreement states that Dickerson pledges "all livestock of every kind and description, including but not limited to beef and dairy cattle, branded or unbranded, plus any increase therefrom, and including steers and bulls now owned by debtor. All accession, additions, replacements, payments for participation in any state or federal farm programs and substitutions . . . ."

We hold that Cornerstone's security agreement includes after-acquired property. The Mississippi Code does not require a financing statement to specifically contain an after-acquired property clause.[42] Interpreting the agreement to include after-acquired property is consistent with "[t]he vast majority of jurisdictions [which] hold that when a security interest is taken in the inventory of a business, after acquired inventory is automatically covered unless it is clearly set out that only certain items of inventory are to be covered." In re McBee.[43] The rationale is that "it is obviously unreasonable to assume that anyone would have received or acquired or intended to acquire a security

_____

[42] See MISS. CODE ANN. § 75-9-502 cmt. 2 and § 75-9-204 cmt. 7.

[43] 714 F.2d 1316, 1330–31 (5th Cir. 1983) (quoting Get It Kwik of Am. v. First Ala. Bank, 361 So. 2d 568 (Ala. Ct. App. 1978), overruled on other grounds, Ex parte Harsco Corp., 689 So. 2d 845, 851–52 (Ala. 1997)), superseded by statute on other grounds as stated in, ITT Commercial Fin. Corp. v. Bank of the West, 166 F.3d 295, 304 n.13 (5th Cir. 1999); see In re Filtercorp, Inc., 163 F.3d 570, 579 (9th Cir. 1998) (citing McBee, 714 F.2d at 1330–31).

16

interest in an inventory with the rigid limitation that it should be limited to the same items which made up the inventory on the date the document was executed."[44]

The Tenth Circuit's decision in In re Grey is helpful. In Grey, the court held that a security agreement established the parties' intent to include after-acquired property where the agreement gave the bank a security interest in the debtor's livestock and farm equipment, which was updated monthly, and "any and all increases, additions, accessions, substitutions and proceeds thereto and therefor."[45] The court held that the parties clearly intended to include after-acquired property because livestock and farm equipment "by its very nature rotated constantly and accordingly required a monthly update of the inventory."[46]

Peoples posits that Cornerstone's security agreement did not include after-acquired property because Dickerson did not so intend. Notably, Dickerson gave another security interest to Cornerstone that included a specific after-acquired property clause. Peoples argues that the fact that Cornerstone's 1999 security agreement lacks similar language indicates that Dickerson did not intend to give Cornerstone a security interest in his after-acquired property.

The argument is unavailing. We follow Grey and McBee and hold that Cornerstone's security agreement includes after-acquired property. Like Grey, Dickerson dealt in farm products, and it would be unreasonable to assume that Cornerstone would intend to acquire a security interest only in Dickerson's property as of 1999.[47] The language in Cornerstone's security agreement is also

---

[44] In re McBee, 714 F.2d at 1331 (internal quotations and citation omitted); see Filtercorp, 163 F.3d at 579; In re Grey, 902 F.2d 1479, 1481 (10th Cir. 1990) (per curiam).

[45] 902 F.2d at 1481.

[46] Id.

[47] Grey, 902 F.2d at 1481; see McBee, 714 F.2d at 1330–31.

very similar to that in Grey.[48]

## III. Conclusion

The judgment is REVERSED and the cause is REMANDED for proceedings consistent with this opinion.

---

[48] See 902 F.2d at 1481.